# In the United States Court of Federal Claims

No. 15-1448C, No. 15-1564C, and No. 15-1565C (consolidated)

(Filed: July 15, 2016)

| | |
|---|---|
| ANCHOR TANK LINES, LLC, et al.,<br><br>Plaintiffs,<br><br>and<br><br>NEW YORK OIL HEATING<br>INSURANCE FUND,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Action for breach of contract; subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a); dispute over capacity of the government as a signatory to the contract; contractual claims not subject to the Contract Disputes Act; intervention as of right; RCFC 24(a) |

Sara Spiegelman, Wachtel Missry, LLP, New York, New York for plaintiffs.

Jeffrey S. Dubin, Jeffrey S. Dubin P.C., Huntington, New York for plaintiff-intervenor.

David M. Kerr, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With Mr. Kerr on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

  In these consolidated breach of contract cases, plaintiffs Anchor Tank Lines, LLC ("New Anchor") and Tank Acquisition Company, LLC ("Tank") allege that the United States (the "government") breached its obligations to plaintiffs when it failed to indemnify them against the liabilities of a predecessor company, Anchor Tank Lines Corp. ("Old Anchor"). This litigation is derivative of suits brought in the United States District Court for the Southern District of New York. Two separate entities – The New York Oil Heating Insurance Fund (the "New York Oil Heating Fund" or "Fund") and the Trustees and Fiduciaries of the Local 553 Pension Fund and Local 553 Deferred Compensation Fund ("Local 553") – sued New Anchor and Tank in the United States District Court for the Southern District of New York, alleging that New Anchor

and Tank are liable under the Employee Retirement Income Security Act ("ERISA") for Old Anchor's failure to make certain retirement fund contributions. A third entity, OEG Transporting, Inc. ("OEG"), filed suit in the same district court alleging that New Anchor and Tank improperly obtained from Old Anchor title to and possession of nine trailers to which OEG had previously obtained lawful title. In all three cases, New Anchor and Tank assert that the United States is obligated to indemnify them based on provisions in the asset purchase agreement through which New Anchor and Tank acquired the assets of Old Anchor from the government.[1]

Pending before the court is the government's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). The government argues that this court lacks subject matter jurisdiction over the case because the United States signed the purchase agreement "in a representative capacity" as the sole shareholder of Old Anchor, and therefore it is not a party to the contract. Def.'s Mot. to Dismiss ("Def.'s Mot.") at 4, ECF No. 7. The government alternatively argues that even if the United States was a party to the purchase agreement, New Anchor and Tank cannot bring an action for breach of that contract without first submitting a claim to a contracting officer, as required by the Contract Disputes Act ("CDA") of 1978, recodified at 41 U.S.C. §§ 7101-7109. *Id.* at 5.

Also pending before the court is the New York Oil Heating Fund's motion to intervene as a plaintiff in this case. The Fund asserts that it has a right to intervene under RCFC 24(a)(2) because of "its third party beneficiary status" under the purchase agreement through which New Anchor and Tank acquired the assets of Old Anchor. Mem. in Support of the Fund's Mot. to Intervene ("Mot. to Intervene") at 3, ECF No. 9-1. Alternatively, the Fund argues that it should be permitted to intervene under RCFC 24(b)(1)(B) because it has a claim that shares "a common question of law or fact" with the main action. *Id.* at 4.

Both motions have been fully briefed and are ready for disposition.

## BACKGROUND

A. *Indictment of Old Anchor's Principals and Forfeiture of the Company's Assets to the Government*

Old Anchor, formerly known as Mystic Tank Lines Corporation, was an oil transportation company incorporated in Delaware and headquartered in Astoria, New York. Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") Ex. 4 (Indictment, *United States v. Baldari*, No.

---

[1]Three separate actions are pending in this court based on these suits in the district court. The first case, Case No. 15-1448C, stems from the suit by the New York Oil Heating Fund against New Anchor and Tank. In the district court, after New Anchor and Tank had filed a third-party complaint against the United States in the suit by the Fund, that complaint was transferred to this court from the district court. *See* Transfer Compl. ¶ 1, ECF No. 5. The second case, Case No. 15-1564, was based on the suit against New Anchor and Tank by Local 553. Compl. ¶ 1, *Anchor Tank Lines, LLC v. United States*, No. 15-1564 (Dec. 23, 2015). The third case, Case No. 15-1565, was based on the suit against New Anchor and Tank by OEG. Compl. ¶ 5, *Tank Acquisition Co., LLC v. United States,* No. 15-1565 (Dec. 23, 2015). These three cases were consolidated by the court's Order of March 29, 2016, ECF No. 18.

07-cr-0568 (Jul. 12, 2007) ("Indictment")), at 1, ECF No. 21.  Old Anchor "was one of the largest transporters of oil products in the [n]ortheastern United States," although the majority of its business was in the New York City metropolitan area.  *Id.*  Old Anchor operated several transportation companies in this region, as well as several real estate entities that "owned the properties where the transportation companies were located."  *Id.* at 2.  Leonard Baldari was the sole shareholder of Old Anchor, and Michael David Hiller served as its chief financial officer.  *Id.* at 3.

In or around 1990, Mr. Baldari and Mr. Hiller began embezzling heating oil that Old Anchor obtained from certain oil tank storage facilities for delivery to heating oil customers in the New York City metropolitan area and Long Island, New York.  Indictment at 5.  The embezzlement scheme involved the practice of "shorting" or "skimming," whereby transportation company employees would "hold[] back a portion of the heating oil from delivery to the customer while indicating to the customer that [he or she] had received a full delivery of heating oil."  *Id.*  Old Anchor would then notify the heating oil retailer that the full delivery had been made and submit invoices for payment based on an inaccurate amount of oil purportedly delivered.  *Id.*  Old Anchor "subsequently offered the accumulated embezzled heating oil for sale to other retailers at below-market prices, primarily for cash payments."  *Id.* at 6.

In July 2007, Mr. Baldari and Mr. Hiller were indicted in the United States District Court for the Eastern District of New York for embezzlement and conspiracy to launder money.  Transfer Compl. ¶ 7; Indictment at 6-8.  They were arrested and later placed on home detention, a condition of which was that they would not "participate in the day-to-day management of [Old Anchor]."  Pls.' Opp'n Ex. 5, at 2 (Order Setting Conditions of Release).  In connection with this prosecution, the government sought a civil forfeiture of Mr. Baldari's and Mr. Hiller's assets in the amount of approximately $50 million, including "[a]ll right, title and interest . . . in [Old Anchor], and all proceeds traceable thereto."  Indictment at 8-10; Pls.' Opp'n at 2.  A sealed forfeiture order was entered in favor of the government in July 2008.  Pls.' Opp'n at 2.

Mr. Baldari and Mr. Hiller pled guilty to certain crimes in mid-2008, but as of April 2016 neither had been sentenced.  Pls.' Opp'n at 2.  In the intervening time, the government continued to investigate criminal activity in the oil delivery industry.  *Id.*  The government owned and operated Old Anchor from July 2008 to February 2011 as part of this continuing investigation.  *Id.*[2]  Pursuant to the order governing Mr. Baldari's and Mr. Hiller's release, Old Anchor also hired "an independent accountant, at company expense, to provide the government and the [c]ourt with reports every forty-five days detailing, among other things, the current operating balances and estimated worth of [Old Anchor]."  *Id.* Ex. 5, at 2.

B.  *Judgments Against Old Anchor for Delinquent Pension Fund Contributions*

Upon the arrest of Mr. Baldari and Mr. Hiller, between June 2007 and August 2009, Old Anchor did not make required pension fund contributions to Local 553 and the New York Oil

---

[2]After both Mr. Baldari and Mr. Hiller were arrested in July 2007, plaintiffs assert that the government assumed "effective control" over Old Anchor because Mr. Baldari and Mr. Hiller were prohibited from managing the corporation as a condition of their release from custody.  Pls.' Opp'n at 2 n.3.

Heating Fund.  Pls.' Opp'n at 3.  In October 2007, Local 553 sued Old Anchor in the United States District Court for the Southern District of New York for these delinquent contributions. *Id.* at 3 & Ex. 7 (Am. Compl., *Demopoulos v. Mystic Tank Lines Corp.*, No. 07-CV-9451 (S.D.N.Y. 2007)).  Local 553 subsequently filed two additional suits in the same court for delinquent payments through August 2009.  *Id.* at 3 & Ex. 8, at 5-9 (Consent Judgment, *Demopoulos v. Anchor Transit Corp.*, No. 08-CV-5860 (S.D.N.Y. Mar. 18, 2009)); Default Judgment, *Demopoulos v. Reliable Transit Corp.*, No. 10-CV-8324 (S.D.N.Y. Feb. 3, 2011)). Local 553 was awarded a total of approximately $2.5 million in damages plus additional pre-judgment interest and attorneys' fees through judgments in March 2009, September 2010, and February 2011.  *Id.* Ex. 8, at 3-9.  Those judgments remain outstanding.  *Id.* at 4.

In December 2009, the New York Oil Heating Fund also sued Old Anchor in the United States District Court for the Southern District of New York to recover damages for the delinquent pension fund contributions.  Pls.' Opp'n at 4 & Ex. 9 (Compl., *Romita v. Anchor Tank Lines Corp.*, 09-CV-9997 (S.D.N.Y. 2009)).  The Fund obtained a default judgment in its favor in January 2011 and was awarded approximately $504,000 in damages.  *Id.* Ex. 8, at 1-2 (Judgment, *Romita v. Anchor Tank Lines Corp.*, No. 09-CV-9097, 2011 WL 1641981, at *1 (S.D.N.Y. Apr. 29, 2011)).  This judgment is also still outstanding.  *Id.* at 4.

### C.  *Purchase of Old Anchor's Assets By New Anchor and Tank*

In December 2010, New Anchor – formerly known as SG&T Carriers LLC – and Tank were formed "for the purpose of purchasing a portion of the assets of [Old Anchor]."  Pls.' Opp'n Ex. 19, at 13.  New Anchor and Tank entered into a purchase agreement with Old Anchor effective February 28, 2011.  *Id.* at 4 & Ex. 19 ("Purchase Agreement").  The agreement identified Old Anchor as the "Seller," and Mr. Baldari signed the agreement as the "President" of Old Anchor.  Purchase Agreement at 1, 12.  The agreement also identified the United States as the "sole shareholder" of Old Anchor, stating that "the sole shareholder of the Seller obtained title to all of the issued and outstanding shares of capital stock of the Seller as a result of a criminal forfeiture . . . of such stock to the United States [g]overnment."  *Id.* at 1.  An Assistant U.S. Attorney, Diane C. Leonardo Beckman, signed the agreement on behalf of the United States.  *Id.* at 12.

The Purchase Agreement specified that the following assets of Old Anchor would be transferred to New Anchor: (1) inventory and spare parts, (2) all miscellaneous assets listed in a separate schedule, (3) accounts receivable and "amounts due and owing . . . with respect to sales made," (4) permits and other authorizations issued by government bodies, (5) fixed assets and equipment, (6) rights to the name "Anchor Tank Lines Corp." and variations thereof, (7) customer data and related software, (8) books and records relating to these assets, (9) telephone numbers and addresses, (10) goodwill connected to the assets, and (11) "rights to causes of action, lawsuits, judgments and [c]laims of any nature . . . to the extent (and only to the extent) arising with respect to or in any way related to the [a]ssets [acquired by New Anchor or Tank]." Purchase Agreement at 1-2.  Tank was to receive all of Old Anchor's truck leases (the "Assumed Contracts") and vehicles.  *Id.* at 2.  With regard to liabilities of Old Anchor, Section 1.3 of the agreement stated:

4

(a)     Upon the terms and subject to the conditions hereof, as of the [c]losing, Tank shall assume from the Seller only those Liabilities arising with respect to the performance after the [c]losing [d]ate of the Assumed Contracts, excluding any Liability resulting from any breach thereof by a Seller or Anchor on or prior to the [c]losing date (the "Assumed Liabilities").  Neither Purchasers nor their designated permitted assigns nor any of their [a]ffiliates shall assume or undertake to perform, pay, satisfy or discharge any other Liabilities or obligations of Anchor or the Business.  All such Liabilities and obligation[s] other than the Assumed Liabilities are collectively referred to as the "Excluded Liabilities."

(b)     The Seller shall indemnify and defend the Purchasers and their affiliates and their respective stockholders, members, managers, officers, directors, employees, agents, successors, and assigns (the "Purchaser Indemnitees") against, and shall hold them harmless from, any and all losses, damages, claims (including third party claims), charges, interest, penalties, [t]axes, costs and expenses . . . resulting from, arising out of, or incurred by any Purchaser Indemnitee in connection with, or otherwise with respect to:

    (i)     the failure of any representation and warranty contained in this [section] to be true and correct in all respects as of the date of this [a]greement and as of the [c]losing [d]ate; and

    (ii)    any Excluded Liability.

Purchase Agreement at 3.[3]

Section 2.1 of the Purchase Agreement also contained the following representation and warranty regarding title to the assets being transferred:

(a)     Except for Assets subject to leases or licenses, the Seller has good, valid[,] and marketable title to each of the Assets and, by the execution and delivery at the [c]losing of the instruments of transfer provided herein, the Purchaser will be vested with good, valid[,] and marketable title to each of the Assets, free and clear of all Encumbrances and Liabilities of the Seller.

---

[3]The term "Anchor" was not separately defined in the purchase agreement.  "Seller" was defined as Old Anchor.  Purchase Agreement at 1.  "Business" was defined as "a bulk transportation and logistics business with a fleet of 205 vehicles."  *Id.*  "Liabilities" was defined as "any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense) of or by any Person of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate[,] matured or unmatured, or otherwise."  *Id.* at 8.  "Person" was defined as "any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, joint-stock company, trust, governmental body or other entity."  *Id.*

Purchase Agreement at 5.  According to plaintiffs, New Anchor and Tank negotiated the agreement with Gary Miller, an attorney who "represented the interests of the United States Attorney's Office."  Pls.' Opp'n at 4.[4]  In mid-January 2011, Mr. Miller e-mailed William Wachtel, counsel for New Anchor and Tank, to ask if a draft of the purchase agreement was acceptable.  *Id.* Ex. 11 (E-Mail Correspondence between Miller and Wachtel).[5]  Mr. Wachtel responded that he was "[g]rappling with union claim of 2 mil.  Will know more later today."  *Id.*  In response, Mr. Miller stated: "You're getting a rep that the assets are free and clear.  The government will hold money in suspense account for benefit of all creditors."  *Id.*

Contemporaneous with the Purchase Agreement, the United States District Court for the Eastern District of New York entered an order approving New Anchor's and Tank's purchase of the assets forfeited by Old Anchor to the government pursuant to the order of forfeiture entered in July 2008.  Pls.' Opp'n Ex. 12 (Stipulation and Order of Sale ("Order of Sale")).  The Order of Sale stated that Mr. Baldari wanted to sell Old Anchor "to preserve the value of the [c]ompany and to partially satisfy" the forfeiture money judgment consequent to his prior guilty plea.  *Id.* at 2.  The order further stated that Mr. Baldari had transferred all of his shares of Old Anchor to the United States, and that "the Company" (as opposed to Mr. Baldari), through the office of Mr. Miller, had entered into a contract of sale for Old Anchor's assets.  *Id.*  The order indicated that the assets of Old Anchor "shall be transferred free and clear of all liabilities, obligations, encumbrances and liens of and on the [c]ompany."  *Id.*  The proceeds of the sale were to be sent to the United States Attorney's Office in New York and then transferred to the Department of Treasury to be placed in an interest-bearing escrow account, which would be held pending further order of the district court in the criminal action against Mr. Baldari and Mr. Hiller.  *Id.*

D.  *Suits Against New Anchor and Tank Based on Old Anchor's Liabilities*

1.  *The New York Oil Heating Fund's suit against New Anchor and Tank for delinquent retirement fund contributions.*

In December 2011, the Fund sued New Anchor and Tank in the United States District Court for the Southern District of New York for damages related to Old Anchor's delinquent pension fund contributions.  Pls.' Opp'n at 7 & Ex. 13 (Third Am. Compl., *Romita v. Anchor Tank Lines*, No. 11-CV-9641 (S.D.N.Y. Aug. 28, 2014) ("Fund Compl.")).[6]  The Fund asserted

---

[4]Mr. Miller is listed in the purchase agreement along with Ms. Leonardo Beckman as a point of contact for Old Anchor, although unlike Ms. Leonardo Beckman he is not identified as a representative of the government.  Purchase Agreement at 9-10.  Mr. Miller is identified elsewhere in correspondence with New Anchor and Tank as a Principal for The Trident Group in Lynbrook, New York.  Pls.' Opp'n Ex. 11.  Mr. Miller did not sign the purchase agreement.  *See* Purchase Agreement at 12.

[5]Mr. Wachtel signed the purchase agreement on behalf of New Anchor and Tank and is identified as the "Manager" of both entities.  Purchase Agreement at 12.

[6]The Fund's original complaint was dismissed for lack of subject matter jurisdiction because the Fund "fail[ed] to allege that [New Anchor and Tank] committed any independent violation of ERISA or the terms of the employee benefit plan."  *Romita v. Anchor Tank Lines, LLC*, No. 11-CV-9641, 2013 WL 432903, at *3 (S.D.N.Y. Feb. 1, 2013) (citing *Peacock v.*

that New Anchor and Tank were liable for these contributions as successors to Old Anchor because they were "affiliated entities or alter egos" of Old Anchor within the provisions of ERISA, specifically 29 U.S.C. §§ 185(a), 1002(37)(B), and 1002(40)(B).  Fund Compl. ¶¶ 12, 75-78.[7]  The complaint noted that the acquisition was structured so that New Anchor and Tank could seamlessly assume the business operations of Old Anchor, and that all of Old Anchor's employees and officers – including Mr. Baldari – became employees and officers of New Anchor and Tank.  Fund Compl. ¶¶ 56-62.

New Anchor and Tank subsequently filed a third-party complaint against the United States in July 2014, alleging that the government was required to indemnify New Anchor and Tank against Old Anchor's liabilities, including the Fund's ERISA claim, pursuant to the provisions of the Purchase Agreement.  Pls.' Opp'n at 7 & Ex. 14 (Third-Party Compl., *Romita*, No. 11-CV-9641 (Jul. 2, 2014)).  The New York Oil Heating Fund later added the United States as a defendant in its complaint, alleging that during the period of delinquent contributions, the government "exercised 'authority or control respecting management on disposition' over certain assets of the Fund," thereby becoming a fiduciary of those assets within the meaning of 29 U.S.C. § 1002(21)(A).  Fund Compl. ¶¶ 22-35, 85-90.

In September 2015, the district court issued an order transferring New Anchor's and Tank's third-party complaint to this court based on its finding that the Court of Federal Claims is the only court with "jurisdiction to render judgment . . . upon any express or implied contract with the United States."  *Romita v. Anchor Tank Lines*, LLC, No. 11-CV-9641, 2015 WL 5698548, at *3 (S.D.N.Y. Sept. 25, 2015) (quoting the Tucker Act, 28 U.S.C. § 1491(a)).  Consequently, the Fund also dismissed its complaint against the United States after discussing with the district court its intent to move to intervene in the present case.  Mot. to Intervene at 1.

2.  *Local 553's suit against New Anchor and Tank for delinquent retirement fund contributions.*

In September 2014, Local 553 sued New Anchor and Tank to recover approximately $2.5 million in damages related to Old Anchor's delinquent pension fund contributions.  Pls.' Opp'n at 9 & Ex. 17 (Am. Compl., *Demopoulos v. Anchor Tank Lines*, No. 14-CV-7107 (S.D.N.Y. Jan. 8, 2015) ("Local 553 Compl.")); *see also Demopoulos v. Anchor Tank Lines, LLC*, 117 F. Supp. 3d 499, 513 (S.D.N.Y. 2015).  Similar to the New York Oil Heating Fund's suit, Local 553 argued that New Anchor and Tank were "affiliated entities or alter egos" of Old Anchor within the meaning of 29 U.S.C. § 1002(37)(B), or were otherwise liable as successors to Old Anchor.  Local 553 Compl. ¶¶ 41, 99.  Local 553 also argued that, pursuant to a settlement agreement entered after Local 553's first suit against Old Anchor (Case No. 07-CV-9451), the "parties agreed that in the event of the sale or transfer of stock or substantially all the assets of [Old

---

*Thomas*, 516 U.S. 349, 353 (1996)).  Contemporaneously, the district court granted the Fund leave to amend its complaint.  *Id.*

[7]The Fund's complaint also named Mr. Baldari and Mr. Hiller as "individual defendants," asserting that they exercised control over disposition of the Fund's assets such that they became fiduciaries of those assets within the meaning of 29 U.S.C. § 1002(21)(A).  Fund Compl. ¶¶ 14-21, 70-71.

Anchor], the purchaser or transferee would be liable for the amounts owed by [Old Anchor]," and therefore New Anchor and Tank incurred liability for the pension fund contributions when they purchased the assets of Old Anchor.  Local 553 Compl. ¶¶ 68, 100.[8]

In Local 553's action, as in the case initiated by the Fund, New Anchor and Tank filed a third-party complaint against the United States in May 2015, asserting that the government was required to indemnify them against liabilities incurred by Old Anchor.  Pl.'s Opp'n. at 9.  In July 2015, the district court dismissed Local 553's suit for lack of subject matter jurisdiction because Local 553 "ha[d] not alleged that [New Anchor and Tank] committed any independent violation of ERISA."  *Demopoulos*, 117 F. Supp. 3d at 513 (citing *Peacock*, 516 U.S. at 357).[9]  Unlike with the Fund's original complaint, the district court did not grant Local 553 leave to amend its complaint to address this jurisdictional defect.  Following this dismissal, New Anchor and Tank voluntarily dismissed their third-party complaint against the government and pursued the instant action in this court.  Pls.' Opp'n at 10.

    3.  *OEG's suit against New Anchor and Tank for conversion of trailers.*

In December 2013, OEG sued New Anchor and Tank for conversion of nine trailers to which it purportedly obtained title from Old Anchor in 2009.  Pls.' Opp'n at 10 & Ex. 10 (Compl., *OEG Transporting, Inc. v. Tank Acquisition Co. LLC*, No. 13-CV-9018 (S.D.N.Y. Dec. 19, 2013) ("OEG Compl.")).[10]  OEG alleged that at some point during or before March 2011, Old Anchor "obtained duplicate title certificates to the [t]railers" and "purported to transfer title to the [t]railers to Tank."  OEG Compl. ¶¶ 11-12.  New Anchor and Tank allegedly obtained certificates of title and took possession of the trailers, and have since refused to return them to OEG.  OEG Compl. ¶¶ 13-15.  This suit against New Anchor and Tank is still pending.  Pls.' Opp'n at 10.

As with the Fund and Local 553 suits, New Anchor and Tank filed a third-party complaint against the United States, alleging that the government was required to indemnify them against OEG's claims under the provisions of the asset Purchase Agreement.  Pls.' Opp'n at 10.  After the district court's decision to transfer the third-party complaint in the Fund's suit to this court, New Anchor and Tank voluntarily dismissed its third-party complaint in OEG's action and pursued the instant action in this court.  *Id.*

---

[8] Like the Fund's suit, Local 553's complaint named Mr. Baldari and Mr. Hiller as "individual defendants," asserting they were fiduciaries of the Fund's assets within the meaning of 29 U.S.C. § 1002(21)(A).  Local 553 Compl. ¶¶ 17-23, 92-94.

[9]The district court also dismissed Local 553's complaints against Mr. Baldari and Mr. Hiller because those complaints were brought outside the applicable limitations period prescribed by ERISA, 29 U.S.C. § 1113.  *Demopoulos*, 117 F. Supp. 3d at 508-11.

[10]The complaint names "LBT Tank Holdings, Inc." as an additional plaintiff through which OEG allegedly obtained title to the trailers.  OEG Compl. ¶ 3.  LBT Tank Holdings, Inc. is apparently the name used by Old Anchor subsequent to purchase of substantially all of its assets by New Anchor and Tank in February 2011.  *See* OEG Compl. ¶ 3.

## MOTION TO DISMISS

### A. *Subject Matter Jurisdiction*

The Tucker Act, 28 U.S.C. § 1491, grants this court jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). "Because the Tucker Act 'does not confer any substantive rights upon a plaintiff,' the plaintiff[s] also 'must establish an independent substantive right to money damages from the United States – that is, a money-mandating source within a contract, regulation, statute or constitutional provision – in order for the case to proceed.'" *Laughlin v. United States*, 124 Fed. Cl. 374, 381 (2015) (quoting *Volk v. United States*, 111 Fed. Cl. 313, 323 (2013) (in turn citing *United States v. Testan*, 424 U.S. 392, 398 (1976); *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1306 (Fed. Cir. 2008))), *appeal docketed*, No. 16-1627 (Fed. Cir. Feb. 24, 2016). The court must dismiss any claims for which it determines that it does not have subject matter jurisdiction. *See* RCFC 12(h)(3).

New Anchor and Tank, as plaintiffs in this instance, must establish this court's subject matter jurisdiction by a preponderance of the evidence before the court can proceed to the merits of their claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998); *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court will "normally consider the facts alleged in the complaint to be true and correct." *Reynolds*, 846 F.2d at 747 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Air Prods. and Chems., Inc. v. Reichhold Chems., Inc.,* 755 F.2d 1559, 1562 n.4 (Fed. Cir. 1985)).

### B. *Whether Plaintiffs Have Made a Non-Frivolous Claim of a Contract with the United States*

In its motion to dismiss, the government asserts that plaintiffs cannot establish jurisdiction in this court under the Tucker Act because they have failed to establish a "contract with the United States" upon which such a claim could be based. Mot. to Dismiss at 3. To support this assertion, the government points to the fact that the Purchase Agreement through which plaintiffs acquired substantially all the assets of Old Anchor identifies the "Seller" as Old Anchor, and not the government. *Id.* at 4.[11] The government acknowledges that a representative of the United States, Ms. Beckman, signed the Purchase Agreement on behalf of the government, but it argues that the United States only "signed the contract in a representative capacity (as the sole shareholder) of the Seller." *Id.*; *see also* Def.'s Reply in Support of Mot. to Dismiss at 1-2,

---

[11]The government further asserts that New Anchor was not a party to the Purchase Agreement, since the purchasers were identified as Tank and "SG&T Carriers LLC." Mot. to Dismiss at 4. This assertion is without merit based on evidence submitted by the plaintiffs that SG&T Carriers LLC changed its name to Anchor Tank Lines LLC (New Anchor) in March 2011, shortly after New Anchor acquired the rights to the "Anchor Tank Lines" name under the provisions of the Purchase Agreement. Purchase Agreement at 13 (Certificate of Amendment of the Articles of Organization of SG&T Carriers LLC).

ECF No. 24 (arguing that the United States signed the purchase agreement because, under New York law, a sale of all or substantially all of a corporation's assets requires shareholder approval).

The government's jurisdictional arguments in this respect are unpersuasive. "The general rule is that so long as the plaintiffs have made a non-frivolous claim that they are 'entitled to money from the United States' . . . because they have a contract right, this court has jurisdiction to settle the dispute." *Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003) (quoting *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667 (Ct. Cl. 1965)); *see also Engage Learning, Inc., v. Salazar,* 660 F.3d 1346, 1353 (Fed. Cir. 2011) ("[J]urisdiction under (the Tucker Act] requires no more than a non-frivolous *allegation* of a contract with the government.") (emphasis in original) (citing *Lewis v. United States*, 70 F.3d 597, 602, 604 (Fed. Cir. 1995); *Gould v. United States*, 67 F.3d 925, 929-30 (Fed. Cir. 1995)); *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (holding that "a non-frivolous assertion of an implied contract with the United States" is sufficient to establish subject matter jurisdiction in this court). Further, this court has jurisdiction over breach of contract claims when the contract is with a "government entity," including government-owned corporations, as long as the entity was "acting on behalf of the government" and Congress has not "unambiguously withdrawn or withheld" Tucker Act jurisdiction from such claims. *Slattery v. United States*, 635 F.3d 1298, 1301 (Fed. Cir. 2011); *see also id.* at 1309-10 (discussing Supreme Court precedent upholding Tucker Act jurisdiction based on "activities of a governmental entity"). Plaintiffs have alleged that the United States was not only the "sole shareholder" of Old Anchor from 2007 to 2011, but also operated the corporation as part of an ongoing investigation of criminal activity in the oil delivery industry. Pls.' Opp'n at 2; Compl. ¶¶ 6-20. In essence, plaintiffs have alleged that during the relevant time period, Old Anchor operated as a "government entity" on behalf of and, at least in part, for the benefit of the United States. In addition, under the terms of the district court's order of sale, the proceeds of the sale of Old Anchor's assets were transferred to the Department of Treasury to be held in escrow pending further action in the criminal case against Mr. Baldari and Mr. Hiller. Order of Sale at 2. These allegations amount to a non-frivolous claim for breach of contract against the United States. Not only are these averments non-frivolous, they are also plausible in light of the fact that, under the terms of Mr. Baldari's and Mr. Hiller's release following their indictment, they were prevented from participating in the day-to-day management of Old Anchor, and the corporation was required to hire an independent accountant to provide financial reports to the government every 45 days. *Id.* at 3 & Ex. 5, at 2.

In light of this evidence, it is disingenuous of the government to assert that Old Anchor, represented by Mr. Baldari, was the only party to the Purchase Agreement and the United States was only involved in a "representative capacity." The court concludes that plaintiffs have made a non-frivolous claim of a contract with the United States, and the court consequently has subject matter jurisdiction over the present case. At this stage of the case, the court recognizes that the capacity in which the governmental signatory executed the contract is a disputed fact, and the court makes no findings in that regard, merely accepting as true the facts and allegations in the complaint for jurisdictional purposes. *Engage Learning*, 660 F.3d at 1355.[12]

_____

[12]The government alternatively moved to dismiss plaintiffs' complaint for failure to state a claim under RCFC 12(b)(6). Mot. to Dismiss at 1. The government based its "failure to state a claim" argument on plaintiffs' alleged failure to "identify a contract on which they can base their

C.   *Whether Plaintiffs' Claims Are Barred By the Contract Disputes Act*

The government further argues that even if plaintiffs had a contract with the United States, their breach of contract claims are barred under the provisions of the CDA, specifically 41 U.S.C. § 7103(a), because these claims were not first submitted to and denied by a "contracting officer." Mot. to Dismiss at 5-6. The government asserts that the CDA applies to the present case because the purchase agreement would constitute an "executive agency contract" for the "disposal of personal property" within the meaning of 41 U.S.C. § 7102(a)(4). *Id.* at 5. The government did not address this argument in its reply brief, suggesting that it has abandoned it. However, to the extent that the government has not abandoned this argument, the court rejects it because the CDA is inapplicable to plaintiffs' present claims.

"The Federal Circuit has observed for many years that the CDA 'does not cover all government contracts.'" *Bailey v. United States*, 46 Fed. Cl. 187, 210 (2000) (quoting *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983), and collecting cases in which the CDA did not apply to a government contract). In particular, the Federal Circuit has found that the CDA does not apply to contracts that do not comport with the "cost and competition" policy considerations underlying the CDA's enactment by Congress, and where applying the CDA would not "do justice to the realities of the situation." *Institut Pasteur v. United States*, 814 F.2d 624, 627-28 (Fed. Cir. 1987) (finding that the CDA did not apply to implied contracts for scientific collaboration); *accord International Indus. Park, Inc. v. United States*, 95 Fed. Cl. 63, 68-69 (2010) (CDA did not apply to a "barter" contract for an easement over real property in exchange for government improvements); *Lublin Corp. v. United States*, 84 Fed. Cl. 678, 683 (2008) (CDA did not apply to an alleged implied contract with the government to keep certain information confidential); *Bailey*, 46 Fed. Cl. at 211 (CDA did not apply to an alleged contract with an individual for repatriation of foreign assets).

Applying these principles here, the purchase agreement at issue in this case does not fit conformably within the meaning of "disposal of personal property," given the context of the ongoing federal investigation. But even if it did, the purchase agreement does not fall within the class of contracts intended to be covered under the CDA. There is no evidence that the sale of Old Anchor's assets was conducted "competitively" (for example, by auction) or that the government was otherwise concerned with promoting competition or reducing costs (or, in this case, maximizing proceeds). Rather, the contract appears to have been intended to transfer the assets previously forfeited to the government to the plaintiffs, which would continue to carry out the oil delivery business in a way that was virtually identical to that of Old Anchor for purposes of a "sting" operation, while at the same time allowing the government to receive funds to satisfy at least part of the civil forfeiture judgment against Mr. Baldari and Mr. Hiller. *E.g.*, Pls.' Opp'n Ex. 12 (stipulating that the proceeds of the sale would be transferred to the Department of

---

claims," in effect merging this argument with its argument that the court lacks jurisdiction under RCFC 12(b)(1). *Id.* at 4. In evaluating a motion under RCFC 12(b)(6), the court must examine whether the claim "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because the court finds that plaintiffs have plausibly alleged a contract with the United States, or an entity acting on behalf of the United States, the government's motion to dismiss under RCFC 12(b)(6) is DENIED.

Treasury); Fund Compl. ¶¶ 56-62 (alleging that all the officers and employees of Old Anchor, including Mr. Baldari, became officers and employees of New Anchor and Tank following the purchase). In that sense, the purchase agreement is more akin to the type of "collaborative effort" distinguished by the Federal Circuit in *Institut Pasteur*, 814 F.2d at 627, than to a competitive procurement or sale intended to be covered by the CDA.

Accordingly, the court finds that the provisions of the CDA do not apply to the Purchase Agreement alleged to be a contract between plaintiffs and the United States. For the reasons discussed, the government's motion to dismiss plaintiffs' complaint is DENIED.

## MOTION TO INTERVENE

The standards and procedures for intervention in a case before this court are governed by RCFC 24. A party may seek "intervention of right" under the provisions of RCFC 24(a), or "permissive intervention" under RCFC 24(b). When considering a motion to intervene as of right, "the court considers (1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction that is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties." *Wolfchild v. United States*, 72 Fed. Cl. 511, 520 n. 11 (2006) (citing *American Maritime Transp. Inc. v. United States*, 870 F.2d 1559, 1560 (Fed. Cir. 1989); *Honeywell Int'l, Inc. v. United States,* 71 Fed. Cl. 759, 761-62 (2006); *Klamath Irrigation Dist. v. United States,* 64 Fed. Cl. 328, 330-33 (2005)). Contrastingly, the court may allow a party to intervene when it "has a claim or defense that shares with the main action a common question of law or fact." RCFC 24(b). "[T]he requirements for intervention are to be construed in favor of intervention." *American Maritime Transp.,* 870 F.2d at 1561. Notwithstanding this general rule, however, "[i]ntervention is proper only to protect those interests which are 'of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment.'" *Id.* (quoting *United States v. American Telephone & Telegraph Co.,* 642 F.2d 1285, 1292 (D.C. Cir.1980)) (emphasis in original).

The Fund's motion is timely because it was filed on March 3, 2016, shortly after the government filed its motion to dismiss in lieu of an answer to the complaint on February 22, 2016. Mot. to Intervene at 3. The Fund has also claimed a "legally protected interest" related to the subject of this action because it alleges that it "is a third party beneficiary to the contract which provides for the [delinquent retirement] contributions," referring to the 2007-2010 Master Contract of Local 553 ("Master Contract"). *Id.* (citing 6 James Wm. Moore, *Moore's Federal Practice* § 24.03[2][a] at 24-25 (3d ed. 2012) ("A movant's interest must be direct, substantial, and legally protectable." (internal quotation marks and citations omitted))).[13] Relatedly, the Fund argues that the United States "controlled" Old Anchor during the time period in which the retirement contributions were due, such that the United States became a fiduciary within the

---

[13]The Fund also states that it is a third party beneficiary "under the contract between Anchor and the United States," presumably referring to the Purchase Agreement's provisions for the "Seller" (allegedly, the United States) to indemnify New Anchor and Tank against Old Anchor's liabilities. Mot. to Intervene at 3.; *see also* Purchase Agreement at 3.

meaning of 29 U.S.C. § 1002(21)(A) of assets that, under the Master Contract, were the Fund's property. *Id.* at 3 & Ex. A ¶¶ 13-14, 18-26.  This is the same argument the Fund made in its pending district court action against multiple defendants, including the United States, in an attempt to recover the judgments it has already obtained against Old Anchor because, as a practical matter, Old Anchor is a defunct entity.  Fund Compl. ¶¶ 22-35, 85-90; *see also* Status Conf. Tr. 9:19 to 10:4 (Mar. 29. 2016) (explaining that Old Anchor is defunct).

The final disposition of the present action will resolve, at least in part, the question of the extent to which the United States controlled and operated Old Anchor prior to and at the time of the sale of Old Anchor's assets to New Anchor and Tank.  Accordingly, this disposition could impair or adversely affect the Fund's ability to pursue its ERISA claims against the United States in the future, absent its ability to intervene here.  *See* 6 *Moore's Federal Practice* § 24.03[3][a] at 24-41 ("A movant's interest is plainly impaired if disposition of the action in which intervention is sought will prevent any future attempts by the movant to pursue its interest." (citing *Washington Elec. Coop. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 98 (2d Cir. 1990))).  Finally, the Fund has plausibly alleged that its interests in the present action are not adequately represented by New Anchor and Tank because the Fund's right to recovery under ERISA and as a third-party beneficiary to the Master Contract differs from New Anchor's and Tank's breach-of-contract theory of recovery.  Mot. to Intervene at 3-4.

Accordingly, the court finds that the New York Oil Heating Fund has established its right to intervene in the present action under RCFC 24(a).

## CONCLUSION

For the reasons stated, the government's motion to dismiss under RCFC 12(b)(1) and 12(b)(6) is DENIED.  The New York Oil Heating Fund's motion to intervene is GRANTED. The Fund's complaint as intervening plaintiff, proffered with is motion to intervene, is deemed to be filed as of the date of this decision.

The government is requested to file its answers to plaintiffs' and plaintiff-intervenor's complaints by August 31, 2016.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge