# In the United States Court of Federal Claims

Nos. 15-1448C, 15-1564, & 15-1565C (Consolidated)

(Filed:  February 23, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ANCHOR TANK LINES, LLC, et al., | Claim for breach of contract; seizure of ownership of entity involved in a criminal enterprise; role of government as sole shareholder in operation of entity and in sale of assets; genuine disputes of material fact barring summary judgment |
| Plaintiffs, | |
| and | |
| NEW YORK OIL HEATING INSURANCE FUND, | |
| Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Sara Spiegelman, Wachtel Missry LLP, New York, New York for plaintiffs.

Jeffrey S. Dubin, Huntington, New York for plaintiff-intervenor New York Oil Heating Insurance Fund.  With him on the briefs and at the hearing was Amy E. Strang, Huntington, New York.

David M. Kerr, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Chad A. Readler, Acting Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Diane C. Leonardo, Assistant United States Attorney, Central Islip, New York.

## OPINION AND ORDER

LETTOW, Judge.

Pending before the court in this group of related cases is a suite of cross-motions for summary judgment that pose the question whether the United States is required to indemnify

plaintiffs, Tank Acquisition Company, LLC and Anchor Tank Lines, LLC (collectively, "New Tank"), for certain unpaid pension and employer-benefit liabilities owed to plaintiff-intervenor, the New York Oil Heating Insurance Fund ("New York Oil Heating Fund" or "Fund"),[1] and other pension funds, arising out of the operations of Anchor Tank Lines Corporation ("Old Anchor").

The parties have fully briefed their respective cross-motions for summary judgment, and a hearing was held on December 21, 2017.  Consequently, this matter is ready for disposition. Because the court finds that genuine disputes of material fact exist as to key issues presented by the parties' motions, granting summary judgment for any party is improper.

BACKGROUND[2]

Old Anchor was a heating oil shipping company that has been and is the subject of a longstanding criminal prosecution in the United States District Court for the Eastern District of New York.  The United States is prosecuting Old Anchor's sole shareholder, Leonard Baldari, on charges of embezzlement by "skimming," a practice in which deliveries of specified quantities of heating oil are made, but a portion is held back, thereby charging the agreed-upon price for a lesser quantity of oil.  The quantity of oil held back is then sold separately for the benefit of the skimmer.  As part of the indictment, the United States sought forfeiture of "all property involved in the [skimming] conspiracy . . . and all property traceable to such property."  Def.'s Mot. for Summary Judgment ("Def.'s Mot.") Ex. 1 (Indictment (July 12, 2007) at 11), ECF No. 36-1.  Mr. Baldari pled guilty in July 2008, and agreed to forfeit his ownership of Old Anchor.  Def.'s Mot. at 6 (citing Consent Order of Forfeiture (July 24, 2008)).

Old Anchor was operated for a time following the seizure of its ownership by the government.  Mr. Baldari was released on a personal recognizance bond but, with limited exceptions, was confined to his home and ordered "not [to] participate in the day-to-day management of [Old Anchor]."  Def.'s Mot. Ex. 2 (Order Setting Conditions of Release (Aug. 1, 2007) at 2).  Old Anchor was required to "hire an independent accountant, at company expense, to provide the government and the [c]ourt with reports every forty-five days, detailing, among other things, the current operating balances and estimated net worth of [Old Anchor]."  *Id.*  That accountant was engaged to perform "compliance and reporting" functions, and it made reports to

---

[1]References to the New York Oil Heating Insurance Fund will relate specifically to that fund.  *See* Hr'g Tr. 53:14-21 (Dec. 21, 2017).  Old Anchor failed to make required payments to other pension funds not party to the present consolidated suits, so a reference to "pension funds" includes the collective union pension funds to which Old Anchor had and has unsatisfied obligations.

All further citations to the transcript of the hearing held on December 21, 2017 will omit the date.

[2]The recitation of facts that follows is taken from the parties' pleadings, their cross-motions for summary judgment, and the documentary materials submitted with the parties' motions.

2

the United States Attorney's Office and the United States District Court for the Eastern District of New York, commencing on October 5, 2007.  Def.'s Mot. Ex. 3.  The documentary materials provided by the parties to the court do not disclose with any specificity who was responsible for the direct, day-to-day management of Old Anchor or who was responsible for its financial affairs.  New Tank suggests that Old Anchor "was operated as an undercover operation after the Indictment."  Pls.' Opp'n to Def.'s Mot. for Summary Judgment and Cross-Mot. for Summary Judgment ("Pls.' Cross-Mot.") at 4 & n.2 (emphasis omitted), ECF No. 39.  In any event, during the pendency of the criminal proceedings and after the seizure of ownership in Old Anchor by the government, from about July 2007 to August 2009, Old Anchor failed to make pension payments it owed to union pension funds and to plaintiff-intervenor, New York Oil Heating Fund.  *See id.* 9-10 & n.5.  That failure prompted the pension funds to file suit, eventually obtaining judgments against Old Anchor totaling $2,983,218.14.  *See* Pls.' Reply at 6, ECF No. 43; Pl.-Intervenor's . . . Mem. . . . in Opp'n to Def.'s Mot. for Summary Judgment and in Support of its [Cross-]Mot. for Summary Judgment ("Pl.-Intervenor's Cross-Mot.") at 1, ECF No. 40-13.

In late November 2009, a proposal to purchase Old Anchor surfaced, *see* Def.'s Mot. Ex. 8 (E-mail from M. Rosenman to W. Wachtel (Nov. 25, 2009)), and negotiations for the sale of Old Anchor proceeded throughout 2010 into early 2011; *id.* Exs. 9 through 28 (various e-mails). In 2010, Mr. Baldari formed a plan for Old Anchor to file for bankruptcy and contemporaneously to submit a plan of reorganization that would infuse money and resources into the company.  *See* Def.'s Mot. Ex. 11 (E-mail from L. Baldari to J. Cranston et al. (May 5, 2010)).  Old Anchor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 3, 2010, *In re Anchor Tank Lines Corp.*, No. 10-45230 (ESS), but that petition was opposed by the United States, *see generally* Pls.' Reply Ex. 40 (United States' Mem. of Law in Support of a Mot. for an Order to Dismiss the Case, filed in No. 10-45230 (ESS)).  In its motion to dismiss the bankruptcy petition, the government averred that

> [Mr.] Baldari's right[,] title[,] and interest in the corporations known as Mystic and Anchor and all proceeds traceable thereto were forfeited to the United States. Upon entry of a forfeiture order, the debtor no longer has an interest in the forfeited assets.  Accordingly, the assets of Anchor are not part of the bankruptcy estate.

*Id*. at 1-2.  The bankruptcy petition was accordingly dismissed.  Pls.' Reply at 5.

Negotiations for sale of Old Anchor were undertaken.  In aid of the negotiations, the government retained an attorney, Gary Miller, in August 2010.  Pls.' Cross-Mot. Ex. 6 (E-mail from G. Miller to D. Beckmann, Assistant United States Attorney (Aug. 13, 2010) ("Thank you for entrusting this matter to us.")).  Negotiations thereafter proceeded between the prospective purchasers and Mr. Miller.  *See* Pls.' Cross-Mot. at 5 & n.3.  In due course, Old Anchor's assets were to be sold to New Tank in a proposed transaction proffered to the district court on February 28, 2011, *see* Def.'s Mot. Ex. 29 (Stipulation and Order of Sale with Asset Purchase Agreement attached (Feb. 28, 2011)), which was approved by district court the following day, *see* Def.'s Mot. at 15.

Subsequently, the pension funds filed suits against New Tank, alleging a theory of successor liability for the unpaid fund contributions, and New Tank filed third-party complaints to implead the government, asserting a right to indemnification and breach of contract stemming from the Asset Purchase Agreement, the contract for the sale of assets of Old Anchor.  Those suits were filed in the United States District Court for the Southern District of New York.  *See Anchor Tank Lines, LLC v. United States*, 127 Fed. Cl. 484, 491-92 (2016) (recounting the actions brought in district court).  After the district court decided to transfer the third-party complaint in one of the suits to this court, New Tank voluntarily dismissed the third-party complaint in the other pension fund suit and pursued the actions presently pending in this court. *See id*. at 492.

New Tank asserts a right to recovery against the United States arising out of the Asset Purchase Agreement, while the New York Oil Heating Fund, plaintiff-intervenor, argues that Old Anchor was required to make pension payments pursuant to collective bargaining and trust agreements of which plaintiff-intervenor was a third-party beneficiary and also asserts that the United States is liable under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (currently codified as amended in scattered sections of 29 U.S.C.).  *See* Pl.-Intervenor's Cross-Mot. at 1-2; Hr'g Tr. 53:9 to 66:6.

Mr. Baldari signed the Asset Purchase Agreement in February 2011, representing, as the district court noted in approving the sale, that he "'[wa]s the sole shareholder of [Old Anchor].'" Def.'s Mot. at 15 (quoting Stipulation and Order of Sale).  The Asset Purchase Agreement provided that the proceeds from the sale "shall [be] deposit[ed] . . . in a 'Suspense Account' with the United States government in connection with the [criminal case,] and '[i]n the event that any creditor of [Old Anchor] shall make a claim or claims against [New Tank] relating to the Assets conveyed herein[,] . . . the United States District Court for the Eastern District of New York . . . shall [have] full jurisdiction over such claims.'"  Def.'s Mot. at 16 (quoting Asset Purchase Agreement).

The parties to the Asset Purchase Agreement were Old Anchor as seller and New Tank as purchaser.  Asset Purchase Agreement at GOV01149.  Mr. Baldari signed the Agreement as president of Old Anchor, Diane C. Leonardo Beckmann, Assistant United States Attorney, signed on behalf of the United States as the sole shareholder of Old Anchor, and William B. Wachtel signed on behalf of New Tank.  *See id*. at GOV01160.  A representation in the Agreement states that "it is contemplated that the Assets (herein defined) will be sold to Purchaser free and clear of encumbrances."  *Id*. at GOV01149.  The Agreement provides that New Tank shall assume "only those Liabilities arising with respect to the performance after the Closing Date" and that "Seller shall indemnify . . . Purchaser[]" from losses attributable to "Excluded Liabilit[ies]:"

1.3 Assumed Liabilities.

(a)    Upon the terms and subject to the conditions hereof, as of the Closing, *Tank shall assume from the Seller only those Liabilities arising with respect to the performance after the Closing Date* of the Assumed Contracts, excluding any Liability resulting from any breach thereof by a Seller or Anchor on

4

or prior to the Closing Date (the "Assumed Liabilities").  Neither Purchasers nor their designated permitted assigns nor any of their Affiliates shall assume or undertake to perform, pay, satisfy or discharge any other Liabilities or obligations of Anchor or the Business.  *All such Liabilities and obligation[s] other than the Assumed Liabilities are collectively referred to as the "Excluded Liabilities."*

(b)    *The Seller shall indemnify* and defend *the Purchasers* and their affiliates and their respective stockholders, members, managers, officers, directors, employees, agents, successors and assigns (the "Purchaser Indemnitees") *against*, and shall hold them harmless from, *any and all losses, damages, claims* (including third party claims), charges, interest, penalties, [t]axes, costs and expenses (including legal, consultant, accounting and other professional fees, and costs incurred in enforcing rights under this Section 1.3(b)) (collectively, "Losses") *resulting from*, arising out of, or incurred by any Purchaser Indemnitee in connection with, or otherwise with respect to:

(i)  the failure of any representation and warranty contained in this Section 1.3 to be true and correct in all respects as of the date of this Agreement and as of the Closing Date; and

(ii) *any Excluded Liability*.

(c)    The Seller shall deposit the Cash Purchase Price (herein defined) in a "Suspense Account" with the United States government in connection with the matter United States v. Leonard Baldari, CR07-0568 (the "Suspense Account").

(d)    In the event that any creditor of Seller shall make a claim or claims against Purchasers relating to the Assets conveyed herein, pursuant to 21 U.S.C. Section 853, the United States District Court for the Eastern District of New York (the "Court") shall [have] full jurisdiction over such claims.

(e)    The Purchasers shall indemnify and defend the Seller against, and shall hold it harmless from, any and all [t]axes which are due and payable by the Seller only with respect to the period June 1, 2010 through the Closing Date and are unpaid as of the date hereof.

*Id*. at GOV01151 (italics added).  In addition, Section 2.1 of the Agreement sets out Seller's representations and warranties:

2.    Representations and Warranties of the Seller.

*The Seller represents* and warrants to the Purchaser on the date hereof, *that*:

2.1    Title to Assets.

(a)     Except for Assets subject to leases or licenses, *the Seller has good, valid and marketable title to each of the Assets and*, by the execution and delivery at the Closing of the instruments of transfer provided for herein, *the Purchaser will be vested with good, valid and marketable title to each of the Assets, free and clear of all Encumbrances and Liabilities of the Seller*.

(b)     Except for the representations contained in this Section 2.1, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties, express or implied (including, without limitation, any implied warranty or merchantability or fitness for any particular purpose, which implied warranties are hereby expressly disclaimed), with respect to any matter relating to the Assets. Accordingly, except for the representations contained in this Section 2.1, Purchasers will accept the Assets at the Closing **"AS IS, WHERE IS," and "WITH ALL FAULTS."**

(c)     The Purchasers hereby acknowledge that they were involved in the operations of the Seller prior to the Closing and therefore prepared all of the schedules attached hereto.  The Seller does not make any representation or warranty as to whether any item contained on said schedules are currently owned or in the possession of the Seller.

*Id*. at GOV01153 (italics added).  Notably, judgments in the suits by the pension funds seeking unpaid pension contributions brought against Old Anchor had been issued prior to the district court's approval of the Asset Purchase Agreement, and those judgments remained unsatisfied at that time (and still remain unsatisfied).  *See Anchor Tank*, 127 Fed. Cl. at 489.

### STANDARDS FOR DECISION

A grant of summary judgment is appropriate if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC").  A material fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party.  *Id.* at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  RCFC 56(c)(1)(A).  If the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary

judgment is appropriate.  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The same standard applies when the parties have cross-moved for summary judgment. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009).  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other."  *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).  "Rather, the court must evaluate each motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id.*

## ANALYSIS

### A.  THE PARTIES' CONTRACT CLAIMS

New Tank asserts that it is entitled to indemnification from the government for the pension claims asserted against it.  In support of this argument, it contends that the plain language of the Asset Purchase Agreement makes evident that the indemnification clause contemplated that the government would protect and defend New Tank from preexisting liabilities arising out of its purchase of Old Anchor's assets, and, even if the Asset Purchase Agreement's text is found to be ambiguous, that extrinsic evidence nevertheless requires the same conclusion.  *See* Pls.' Cross-Mot. at 20-24.  Further, New Tank contends that the negotiations that led to the Asset Purchase Agreement were conducted exclusively with the government's agents and personnel, not with Old Anchor's employees.  *See id.* at 21-24.  New Tank also argues that the Asset Purchase Agreement's representation that "at the Closing . . . [New Tank] will be vested with good, valid, and marketable title to each of the Assets, *free and clear of all Encumbrances and Liabilities of the Seller*," Asset Purchase Agreement GOV01153 (emphasis added), was a representation made by the government—and subsequently breached by the government, *see* Pls.' Cross-Mot. at 24-25.

The government's response contests New Tank's characterization of the Asset Purchase Agreement's definition of "Seller," and argues that the indemnification clause is unambiguous on its face in referring to indemnification from Old Anchor and that the representations and warranties are made by the Seller, defined in the Asset Purchase Agreement as Old Anchor.  *See* Def.'s Mot. at 24.  The government supports this characterization as dispositive of New Tank's claims because of the well-settled scope of shareholder liability for corporate obligations.  *See id.* (citing *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474 (2003) ("[A] basic tenet of American corporate law is the corporation and its shareholders are distinct entities.")).  The government also asserts that "New Tank was on notice that the United States was asserting a claim over . . . only Mr. Baldari's 'right, title, and interest' in" Old Anchor, and that "New Tank was thus on notice that it was purchasing assets from [Old Anchor] . . . and not from the United States." Def.'s Mot. at 26-27.

The government further contends, in the alternative, that any right to indemnification under the Asset Purchase Agreement could not have been valid as against the United States because of the Anti-Deficiency Act, ch. 251, § 7, 16 Stat. 251 (repealed and enacted as positive

law in Revised Title 31 by Pub. L. No. 97-258, 96 Stat. 877 (relevant anti-deficiency provisions currently codified at 31 U.S.C. § 1341)).  Additionally, it asserts that satisfaction of the overdue pension contributions was a precondition to the government's consent to the Asset Purchase Agreement, and thus "there is no ambiguity regarding what was being sold: Old Anchor's assets less what was needed to satisfy its ERISA liability," and that, even if the United States must indemnify New Tank, it is not required to do so for the period before which New Tank alerted the United States to the pending lawsuit.  Def.'s Mot. at 30-33.

At bottom, the parties' disputes as to this aspect of the Asset Purchase Agreement center on the contract's language respecting the Seller and the provisions for indemnification and, if this language is found ambiguous, what the parol evidence in the record discloses for purposes of resolving those ambiguities.[3]  At the heart of this dispute, however, are issues of fact that, at this stage, remain intractable.  The evidence in the record is conflicting as to the control exercised by the United States—both in the operation of Old Anchor and in the negotiation process that resulted in the Asset Purchase Agreement.[4]  At this stage, therefore, the court concludes that no

---

[3]*E.g.*, New Tank submits that—under the government's construction—it would be wholly illogical for New Tank to "agree[ ]to pay $900,000 (which the [g]overnment internally believed was more than [Old] Anchor was worth) only to acquire millions of dollars in liabilities."  Pls.' Cross-Mot. at 22 & n.12.

[4]The United States apparently also contests that it had actual ownership of Old Anchor during the period following Mr. Baldari's indictment up to the approval of the Asset Purchase Agreement, drawing a distinction between "seizure" and "forfeiture."  As counsel for the government argued at the hearing:

> [Mr. Baldari] did agree to forfeit his interest, ownership of the company, but that hasn't happened yet.

> . . . We have seized those assets.  The United States possesses them, but there's not legal forfeiture yet because there's no final order of forfeiture.  And that's clear from the Eastern District's order of sale, where it discusses that at that point, the Defendant, the Defendant assures the Court that he is the sole shareholder.

> So at that point, which was when it agreed to do–to allow the pre-forfeiture sale, the Defendant, Mr. Baldari, was still the sole shareholder of the corporation.  The United States became the sole shareholder in a nominal way just as he transferred the shares over right before the asset purchase agreement.  So the United States did sign as sole shareholder, but, again, it doesn't own the shares, it doesn't own Mr. Baldari's interest.  There's been no final order of forfeiture yet.  So even though Mr. Baldari's agreed–he's agreed, he's pled guilty, but there hasn't been a sentencing, and there hasn't been a final order of forfeiture.  So all of this is still at play.

Hr'g Tr. 70:7 to 71:5.

party has met its burden of showing a lack of genuine dispute of material fact and an entitlement to judgment as a matter of law, and therefore all parties' motions for summary judgment as to the indemnification and breach of contract claims must be denied.  Because the court finds that genuine disputes of material fact preclude entry of summary judgment for any party, it does not reach the parties' alternative arguments.

### B.   THE NEW YORK OIL HEATING FUND'S THIRD-PARTY BENEFICIARY CLAIMS

The New York Oil Heating Fund claims that it is a third-party beneficiary to a collective bargaining agreement executed between Old Anchor and its employees, pursuant to which Old Anchor would make certain specified monthly payments to the Fund.  *See* Pl.-Intervenor's Cross-Mot. Ex. A (2007-2010 Master Contract of Teamsters Local Union, No. 553), § 49.[5]  Old Anchor failed to make those required contributions from August 1, 2007 through November 30, 2009, and the Fund brought suit, eventually securing a judgment of $503,953.89 against Old Anchor.  *See* Pl.-Intervenor's Compl. ¶ 16, ECF No. 9-3.  In this court, the Fund asserts that the United States stepped into the shoes of Old Anchor for purposes of the required contributions under the collective bargaining agreement and ERISA.  *See* Pl.-Intervenor's Cross-Mot. at 11; *see also* 29 U.S.C. § 1002(5) ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of . . . a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such . . . agreement."); 29 U.S.C. § 1145 (defining an employer as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan").

"Courts have found the phrase 'act . . . indirectly in the interest of an employer' difficult to interpret." *Massachusetts Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 24 (1st Cir. 1988).  The Second Circuit has concluded that this "language encompasses those who act for an employer or directly assume the employer's duty to make plan contributions," and notes that this phrase has been held to include, for example, "the president of a corporation who under a collective bargaining agreement had assumed a personal obligation to make pension contributions," a "corporation that took control of an employer," and even extended to parent corporations. *Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.3d 561, 575 (2d Cir. 1995) (citing *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 36-37 (2d Cir. 1994); *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 855 (1st Cir. 1993); *Frank v. United States West, Inc.,* 3 F.3d 1357, 1363 & n.5 (10th Cir. 1993)).

To reach the parties' arguments as to whether the United States has "acted indirectly in the interest of an employee," the court must first determine the types of actions the government

---

[5]The Fund relies on a third-party-beneficiary breach of contract theory rather than a pure ERISA theory because this court does not have jurisdiction over ERISA claims.  *See* 29 U.S.C. § 1132(e)(1) (With inapplicable exceptions, "the district courts of the United States shall have exclusive jurisdiction of [ERISA actions] . . . [, and, in some limited instances,] [s]tate courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction.").

took after its seizure of ownership of Old Anchor.  The touchstone of one acting in the interest of an employer is what one actually did, and on this point the parties have failed to establish the necessary factual predicates for a determination.  As the court has already concluded, there is deep disagreement as to what the government's actions were in this case.  There is an absence of evidence as to the extent to which the United States was involved in the operation of Old Anchor.  For this reason, the court concludes that summary judgment in either party's favor is improper, and the parties' cross-motions must be denied.

## CONCLUSION

For the reasons stated, the court determines that genuine disputes of material fact prevent entry of summary of judgment for any party.  The parties' cross-motions for summary judgment on these issues accordingly are DENIED.

The court requests that the parties file a joint status report by March 14, 2018, proposing a plan and schedule for further proceedings in this case.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge